## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TARA PETKA | : | |
| | : | |
| Plaintiff, | : | Case No. |
| | : | |
| v. | : | TRIAL BY JURY |
| | : | DEMANDED |
| GIRL SCOUTS OF CHESAPEAKE BAY, INC. | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT

## THE PARTIES

1.  Plaintiff, Tara Petka ("Plaintiff") was at all times relevant to this complaint a resident of Dover, Delaware.

2.  Defendant, Girl Scouts of Chesapeake Bay, Inc ("Defendant") is a public corporation organized and existing under the laws of the State of Delaware.

## JURISDICTION

3.  This Court has jurisdiction based upon the existence of a question arising under the laws of the United States of America.

4.  Plaintiff Petka has initiated this action to redress violations by Defendant of the Family Medical Leave Act ("FMLA") and the Pennsylvania Human Relations Act ("PHRA"). Plaintiff asserts that Defendant discriminated/retaliated against her for taking FMLA leave.

## VENUE

5. The unlawful employment practices alleged herein were committed within the State of Delaware. Accordingly, venue lies in the United States District Court for the District of Delaware.

## FACTS

6. Tara Petka is a 28-year-old white female.

7. Petka has been an employee of the Girl Scouts since May 9, 2010, as a camp counselor.

8. Petka's work performance has always been outstanding.

9. In August 2020, Petka notified the Girls Scouts of her upcoming surgery and will need to use FMLA leave around August 2020.

10. At the time, Petka was the interim retail manager.

11. Petka's surgery was scheduled for November 5, 2020.

12. Due to Covid, Petka was required to quarantine for two weeks prior to her surgery.

13. Petka took leave on October 23, 2020, initially using earned vacation time (9 days) and then using FMLA leave for the remaining time off for her surgery.

14. On December 7, 2020, Petka received a text message from co-worker Jana about openings for new positions in the Girl Scouts and whether Petka was applying for these positions.

15. Jana also informed Petka that her current position was being abolished.

16. Petka was never informed or invited to apply for these new positions.

17. Petka returned to work on December 16, 2020, as an interim retail manager.

18. Just two days upon returning, Petka requested a meeting with supervisor Amanda Hoprich to get her up to date on new happenings she missed during her leave.

19. Hoprich was supposed to meet with Petka on a bi-weekly basis.

20. Hoprich continually avoided meeting with Petka.

21. After holiday break (January 2, 2021) Petka came into contact with someone with COVID and was required to quarantine for two (2) weeks.

22. During that time, Petka continually asked Hoprich for a meeting over the phone.

23. Hoprich simply instructed Petka to undergo online training for the store's new system. Petka was forced to use 2 ½ weeks of earned vacation for the quarantine.

24. Upon returning on January 19, Petka was called into a meeting with Hoprich and Dizza Hesnur (who took over Petka's position in her absence).

25. During the meeting, it was announced that Petka was being transferred to a new position- outreach.

26. At the end of January, CEO Claudia Pena Poretti, stated she wanted to meet with everyone in the organization.

27. Poretti was scheduled to meet with Petka for an hour.

28. During Poretti's meeting with Petka, Petka complained about discrimination following her FMLA leave.

29. Poretti cut the meeting short and promised to respond to Petka's complaints.

30. However, neither Poretti nor anyone from the Girl Scouts responded to Petka's complaints regarding discrimination after her FMLA leave.

31. Subsequently, during a meeting with Hoprich, Hoprich scolded Petka that she was not happy with her complaining to (the CEO) "above her head" regarding FMLA.

32. In addition, Petka inquired about applying for new positions.

33. Hoprich stated that Petka could not apply for new positions until the inventory in the retail store was gone.

34. However, Hoprich shot down any ideas proposed by Petka to sell the

merchandise.

35. Petka's ideas included but were not limited to Facebook Live sales, merchandise tables at events, and merchandise tables during cookie pick-up.

36. Shortly thereafter, the new position of retail manager was filled. Petka was never offered or allowed to apply for the position during her FMLA leave or afterward.

37. On March 25, 2021, Petka was terminated under the pretext that she ordered "excess inventory".

## COUNT I
## Violations of the FMLA
### (Interference)

38. The Family Medical Leave Act is a federal law that applies to employers that have 50 or more employees.

39. Under this law, eligible employees are allowed to take up to 12 weeks of unpaid leave in a 12-month period for certain qualifying reasons, including a serious health condition.

40. An employer is prohibited from discriminating against employees who have used FMLA leave.[1]

41. Employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring promotions, or disciplinary

---

[1] *Callison v. City of Philadelphia*, 430 F.3d 117 (2005)

actions."[2]  In addition to being retaliatory or discriminatory acts, the actions also constitute "interfering" with the exercise of FMLA rights.[3]

42.   Under the FMLA, Petka was entitled to consideration for promotions and new positions for which she was qualified for during that leave.

43.   Here, Petka was denied openings for several positions within your organization while she was on FMLA leave.

## COUNT II: VIOLATIONS OF FMLA
### (Retaliation)

44.   Paragraphs 1 through 43 are hereby realleged and incorporated herein by reference as if fully set forth herein.

45.   The federal Family and Medical Leave Act ("FMLA") provides an employer cannot retaliate against employees because they were on leave.

46.    Here, Petka was retaliated against when she returned from FMLA leave.

47.   Hoprich refused to accept any ideas regarding getting rid of excess inventory and prohibited Petka from applying for positions which she was qualified for. Specifically, the retail management position.

---

[2] *Id.*
[3] Conoshenti v. Public Service Electric & Gas Company, 364 F.3d 135-Court of Appeals, 3rd Circ. 2004

48. Lastly, Petka was retaliated against when she complained about FMLA violations to the CEO.

49. In order to establish *a prima facie* case for retaliation, Plaintiff must show evidence that: (1) she exercised rights under the FMLA; (2) The Girl Scouts took an adverse employment action against her, and (3) there was a causal connection between her exercise of rights and the adverse employment action. *See Moore v. City of Philadelphia,* 461 F.3d 331, 340–41 (3d Cir.2006).

50. Here, there is no doubt that Petka exercised her rights under the FMLA by both (1) taking FMLA leave and (2) complaining about FMLA violations to the CEO.

51. The Girl Scouts took adverse action against Petka by terminating her.

52. There was a causal connection by (1) the temporal proximity between her protected acts and the adverse employment action and (2) Hoprich's comments that she was upset with Petka going "above her head" with FMLA complaints to the CEO.

53. The adverse employment decision was causally related to her FMLA leave.

54. Plaintiff is entitled to equitable relief (including reinstatement and promotion), economic damages (including lost wages and benefits), liquidated damages, and interest.

55. In addition, Plaintiff will be also entitled to attorneys' fees, expert witness fees, and other costs. 29 U.S.C. §2617(a)(3); 29 C.F.R. §400(c)

**WHEREFORE**, Plaintiff requests this Honorable Court to enter a judgment in her favor and against Defendant as follows:

a. Declare the conduct engaged in by the defendant to be in violation of the plaintiff's statutory rights.

b. Award the plaintiff back pay compensation for her pecuniary losses from the date of the wrongful conduct described herein until the date of any judgment.

c. Award the plaintiff sufficient funds to compensate her for her losses, pain, and mental suffering, which cannot otherwise be compensated by equitable relief.

d. Award the plaintiff compensatory and punitive damages not otherwise specified.

e. Award the plaintiff any and all other liquidated damages, which would make the plaintiff "whole".

      f.      Award the plaintiff attorney fees, the costs of this action, pre-judgment and post-judgment interest, and;

      g.      Such other and further relief as this Court feels proper.

**THE POLIQUIN FIRM LLC**

/s/ Ronald G. Poliquin
RONALD G. POLIQUIN, ESQUIRE
Delaware Bar ID No. 4447
1475 S. Governors Ave.
Dover, DE  19904
(302) 702-5501
*Attorney for Plaintiff Tara Petka*

Dated: October 21, 2021